Robert J. Hommel, Bar No. 009725
Robert J. Hommel, P.C.
10214 N. Tatum Blvd., Ste. A900
Phoenix, Arizona 85028
(480) 778-0123/Fax: (480) 951-5033
attorneys@hommelpc.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Ta'Laura McCalla,<br><br>            Plaintiff,<br><br>vs.<br><br>Ace American Insurance Company, a foreign insurer; Corvel Enterprise Comp, Inc., a foreign managed care cost containment company,<br><br>            Defendants. | Case No. 2:20-CV-01561-JAT<br><br>**MOTION TO LIMIT TESTIMONY FROM TROY WATSON, M.D.**<br><br>**Oral Argument Requested** |

The Plaintiff, Ta'Laura McCalla, through her attorney undersigned, and pursuant to F.R.E. Rules 702 and 403, respectfully moves to prohibit any testimony from the Defendants' designated medical expert, Troy S. Watson, M.D., on the following issues:

    1.    Whether Ms. McCalla has complex regional pain syndrome (CRPS) or not;

    2.    Any testimony opining on the credibility of Ms. McCalla;

    3.    Dr. Watson's personal interpretations of what Ms. McCalla's attending orthopedic surgeon, Dr. Graves, was thinking when he made entries in his records.

    4.    Any testimony on treatment that Dr. Graves "could" have provided.

5. Limiting testimony on the cause of Ms. McCalla's CRPS to the reasoning stated in his report.

Dr. Watson is disclosed to testify about the diagnosis of chronic regional pain syndrome (CRPS) and its alleged causal relationship to the Defendants' delay in authorizing treatment.

Rule 702 requires a district court to consider "whether an expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (in banc), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (in banc) (quoting *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 149 (1999)). The party offering expert testimony must show that the testimony is admissible under Rule 702. *Lust v. Merrill Dow Pharm, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996.)

Rule 26(a)(2)(B)(i), Fed. R. Civ. Proc. requires retained experts to give a complete statement of the basis and reasons for their opinions. Dr. Watson should not be allowed to supplement deficient reasoning.

**DR. WATSON'S QUALIFICATIONS TO OPINE ON CRPS ARE MARGINAL**

Under Rule 702, the trial court must analyze whether the proffered witness is qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Dr. Watson is an orthopedic surgeon with a subspecialty in foot and ankle. (Exhibit 2, deposition of Dr. Watson, 5:12-17) He does not treat CRPS. (Id., 8:6-9:1) When he suspects a diagnosis of CRPS, he refers the patient to a pain management specialist. (Id.)

Although his qualifications to testify on CRPS are marginal, objections to an expert's degree of qualifications go to the weight of the expert's testimony, not its admissibility. *In Re: Apollo Grp. Inc. Sec. Litig.*, 527 F.Supp. 2d 957, 963-64 (D. Ariz. 2007). In other words, "differing areas of expertise are perhaps germane to the weight and allowed scope of [an expert]'s testimony, [but] they do not bar admissibility." *Erickson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, at 4 (D. Ariz. 11/3/2016) (citing *Bergen v. Fn St. Patrick*, 816 F. 2d 1345, 1352 n.5 (9th Cir. 1987). Nevertheless, Dr. Watson's minimal expertise with the subject matter of CRPS amplifies his other failures under Rule 702.

## DR. WATSON'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA BECAUSE HE NEVER EXAMINED MCCALLA

Rule 702(b) requires that an expert's "testimony is based on sufficient facts or data." Dr. Watson has opined: "I am not convinced she had CRPS but again did not see her clinically making this a difficult judgment call." (Exhibit 1: EXPERT WATSON REPORT, at 000023) At deposition he testified that CRPS is a "clinical diagnosis" meaning it can only be established "on an actual clinical encounter with the patient that includes a subjective history taking and conducting a physical exam." (Ex. 2, 7:3-8:2).

"The patient history is one of the primary and most useful tools in the practice of clinical medicine." Federal Judicial Center, Reference Manual on Scientific Evidence, p.452, (2d Ed. 2000). "Because symptoms that preoccupy the patient are not always the most relevant to diagnosis, the physician will often need to ask the patient about symptoms that are particularly useful in diagnosis, but not of particular concern to the patient." Id., at 453-54. Likewise, "[t]he physical examination is a routine procedure for

3

evaluating the patient and determining a diagnosis…. Although signs are more objective than symptoms, they still depend on the physician's skill and objectivity, degree of attention to detail, and level of concern." Id. At 455,456. In sum, both the history taking, and the exam findings, are uniquely intertwined with the expertise of the individual physician.

Diagnosis of CRPS is derived from history taking and exam findings. (Exhibit 2, 7:3-8:2).  There is no one [mechanical] test for CRPS. (Id.) It is undisputed that Dr. Watson did not conduct a physical exam of Ms. McCalla.  He never saw her.  His opinions are limited only to a review of her medical records.

Persuasive federal case law has reasoned those medical opinions that conflict with the opinions of treating physicians, from medical experts who never examined the patient, are not substantial evidence. *Mefford v. Gardner*, 383 F.2d 748, 758 (9th Cir. 1967), *Martin v. Secy of HEW*, 492 F.2d 905, 908 (4th Cir. 1974) (" . . . we think that an examination of the claimant adds such significant weight to a medical opinion as to the presence or absence of disability that, without it, the opinion, standing alone, cannot constitute substantial evidence to support a conclusion that relies solely on it."), *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) ("The testimony of Dr. Lewis cannot provide a sufficient basis for rejecting the opinions of plaintiff's treating physicians since the opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of plaintiff's treating physician.") citing, *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985) (per curiam), *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974) ("We think these written reports, without personal examination of the claimant,

deserve little weight in the overall evaluation of disability. The advisor's assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.") Dr. Watson patently lacks sufficient data for reliability.

Dr. Watson's report further states, "however, if she is continuing today with significant symptoms, an IME could prove helpful by an orthopedic foot and ankle specialist." (Ex. 1, at 00024). He defined *disabling symptoms* at his deposition as "continuing with the inability to live her life productively, meaning going to work, going grocery shopping, doing normal activities that we do in life, I would consider that significant." (Ex. 2, 14:15-16:14, at 15:1-5) That was Ms. McCalla's condition at the time. Because he didn't examine McCalla, Dr. Watson does not possess sufficient facts and data to evaluate McCalla's condition.

In her deposition, which Dr. Watson states he reviewed, Ms. McCalla testified she still isn't back to work (Ex. 3, McCalla Deposition, 18:11-13), she is still taking Tramadol for pain (Id., 11:7-15), and applied for unemployment in September 2020 (Id., 106:21-107:8). Dr. Watson's foundational assumption is erroneous. There is no reliable data to support his assumption that McCalla no longer has significant symptoms.

Dr. Watson acknowledges review of the report from McCalla's treating pain management physician and designated expert, Dr. Laitin, who documents that McCalla has an ongoing diagnosis of complex regional pain syndrome Type I, that includes "burning pain", "a less allodynia, skin temperature: still slightly cooler than left foot, less edema, some joint stiffness. Ambulation: no longer using walker. Better ability to put

weight on right foot and better ability to push off right foot." (Exhibit 4, Dr. Laitin report at McCalla Expert 00998)

Dr. Watson admits he does not have sufficient data to confirm or rule out a diagnosis of CRPS: "…and just to be clear, I don't believe I said that this patient definitively does not have regional pain syndrome. I was just questioning some of the direct statements that your expert was stating definitively about complex regional pain syndrome." (Ex. 2, 11:19-12:12) Dr. Watson also admits he is unable to offer any alternative diagnosis for McCalla's condition because he didn't see and examine the patient. (*Id*. 44:23-45:11)

When diagnostic ambiguity exists, differential diagnosis is a scientifically recognized methodology for confirming diagnosis. "In the process of performing a differential diagnosis, the physician determines which of the two or more diseases with clinical findings is the one that the patient is suffering from." Reference Manual, id., at 463. "Differential diagnosis is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.' Stedman's Medical Dictionary 474 (26 ed. 1995)." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003).

> "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests,' and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of those potential causes until reaching one that cannot be ruled out or

> determining which of those that cannot be excluded is the most likely." *Clausen, Id.*

In questioning the diagnosis of three treating physicians, Dr. Watson did not make a differential diagnosis. Nor did he have the basis to do so.

> "The initial, or working, diagnosis provides a context or template for gathering further information and specifying tests to confirm or refute the working diagnosis. Each working diagnosis implies the presence of certain symptoms or test results and the absence of others if the patient has the given disorder. The physician modifies and refines the working diagnosis as additional information is gathered, generating new diagnoses as the old ones are pushed aside by inconsistent findings. (Citation omitted) In essence a physician thinks the patient probably has Condition X and orders tests that will verify or refute this diagnosis. If the diagnosis is refuted, the physician reshapes the diagnostic hypothesis and orders additional tests that may be required. Experienced physicians select and test the most probable hypothesis first. This is the generally accepted (though seldom formally acknowledged) methodology that physicians employ to arrive at diagnosis." Reference Manual on Scientific Evidence, *Id.* p.464

Dr. Watson agrees that CRPS is a clinical diagnosis. It is a diagnosis that can only be made by a personal encounter with the patient, subjectively and objectively. He did neither. Dr. Watson's opinions lack a foundation in the admitted, and well-established methodology to confirm or exclude a diagnosis of CRPS. Allowing him to speculate on the presence or absence of the diagnosis, based on what he opines other doctors were thinking, or giving preference to one doctor's opinions over another also fails both the requirement that expert testimony be "the product of reliable principles and methods", Rule 702(c), and that "the expert has reliably applied the principles and methods to the facts of the case." Rule 702(d).

## **DR. WATSON SHOULD NOT BE ALLOWED TO PARROT OTHER DOCTORS OPINIONS ABOUT MCCALLA'S SIGNS AND SYMPTOMS**

Dr. Watson next indirectly impugns Ms. McCalla's credibility by stating the "red flags" of "symptom amplification" were observed by two other doctors (Dr. Leonetti and Dr. Borowsky). (Exhibit 1, Expert Watson Report at 000023; Exhibit 2, 36:10-37:5, 34:17-36:9) Dr. Watson could not hold a personal opinion on this issue, because he did not examine Ms. McCalla. Remarkably, Dr. Watson could not identify what symptoms were allegedly amplified. (Exhibit 2, 40:8-25) ("… its more of a gestalt…"). In other words, his opinion is not a scientific conclusion supported by empirical observation, but rather a feeling that can't be explained by articulated data. Rule 702 does not countenance expert opinion premised on speculative "gestalt". "Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 2795 (1993). Opinion based on unsubstantiated and undocumented information is the antithesis of scientifically reliable expert opinion. *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014), citing *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).

Notably, not one of Ms. McCalla's treating physicians, Dr. Graves, Dr. Ladin, nor Dr. Laitin ever noted any questionable findings in Ms. McCalla's presentation.  The only physicians who expressed opinions of symptom amplification were single visit IME physicians, Dr. Leonetti and Dr. Borowsky. Dr. Watson adopts their opinion of symptom magnification without regard for, or discussion of, the solid findings of three treating doctors.

8

As noted in Dr. Laitin's expert report, despite Dr. Borowsky's ultimate opinion, his IME found all the hallmarks of CRPS, but failed to appreciate the diagnosis. (Exhibit 4, Dr. Laitin report at McCalla Expert 00990-991) One of the criteria for reliability is the expert's accounting for obvious alternative explanations. *Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 3160. (D. Vt. 2002) citing *Ambrosini v. Labarraque*, 101 F. 3d 129, 140 (D.C.Cir.1996). Dr. Watson fails this standard, arbitrarily parroting the workers' compensation IMEs.

Dr. Leonetti is a podiatrist who saw Ms. McCalla only once on July 30, 2018. His report is dated July 31. Dr. Leonetti did not report on a Tinel's exam, and did not appreciate any component of nerve pain. (Exhibit 5, Dr. Leonetti IME, at CorVel EC McCalla File 000575-76) Dr. Graves is an orthopedic surgeon, with a subspecialty in foot and ankle, who first examined Ms. McCalla on July 31, 2018, the day after Dr. Leonetti. He explicitly noted nerve pain as the dominant feature of her presentation. (Exhibit 6, Dr. Graves office note of 7/31/18, CorVel EC McCalla File 000192) Whether Ms. McCalla was experiencing neurological pain is a significant dispute between the evaluations of Dr. Leonetti and Dr. Graves, both of whom examined her. Permitting Dr. Watson to arbitrarily adopt one over the other, without any scientific methodology, has prejudicial effect that vastly outweighs its potential relevance. Fed. Evid. Rule 403. Nor is arbitrary adoption of one opinion over another the reliable application of principles and methodology to facts under Rule 702(d).

Likewise, Dr. Borowsky had a single visit on May 21, 2020, as an IME examiner in the underlying worker's compensation claim. Dr. Borowsky disputed the diagnosis of

CRPS because he did not appreciate enough diagnostic signs at the time of his visit. (Exhibit 7, Dr. Borowsky IME at CorVel EC McCalla File at 000889) It is undisputed that both Dr. Ladin and Dr. Laitin personally observed the diagnostic criteria. A hallmark of CRPS is its day-to-day variability. "*Complex* indicates the varied and dynamic nature of the clinical presentation, not only within a single individual over time but also between individuals with apparently similar disorders." Essentials of Pain Medicine & Regional Anesthesia, 2nd Ed. Benzone, Raja, Molloy, Liu, Fishman, Chapter 46, p.376. (Exhibit 4 at Medical Expert 00998)

Absent his own history taking and exam, Dr. Watson should not be allowed to render opinions based only on the data interpretations of other doctors.

**DR. WATSON SHOULD NOT BE ALLOWED TO ACCUSE MS. MCCALLA OF SYMPTOM MAGNIFICATION BECAUSE CREDIBILITY OPINIONS INVADE THE PROVINCE OF THE JURY**[1]

Accusing Ms. McCalla of symptom amplification is an implicit, if not direct, opinion on her credibility. The medical labeling necessarily rejects the credibility of her symptom reporting. It is a jury function to determine a witness' credibility. *United States v. Binder,* 769 F.2d 595, 602 (9th Cir. 1985). An expert witness is not permitted to testify specifically to a witness' credibility. *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).

Because Dr. Borowsky did not recognize the diagnosis of CRPS, almost by definition, Ms. McCalla's allodynia could only be interpreted as symptom magnification. The distinction between truthful symptom reporting and exaggeration is simply too

---

[1] Any testimony from Dr. Leonetti or Dr. Borowsky on alleged "symptom amplification" should also be excluded as an impermissible comment on credibility. If anything, the doctors should be allowed to say they did not appreciate findings that explained the degree of pain.

10

crucial to allow a physician who has not examined the patient to adopt another physician's opinionated label, and testify to a jury about it as a fact. Symptoms are uniquely subjective to the patient. The doctor should be allowed to say they did not report objective findings that explain the degree of pain. Characterizing the symptoms as amplified deprives the jury of their right to decide.

As noted previously, Dr. Watson could not even say what symptoms Ms. McCalla was allegedly amplifying for Drs. Leonetti or Borowsky. (Exhibit 2, 40:8-25) Dr. Watson in essence, resolves the conflicting opinions between the IME doctors and the treating physicians. That is a function for the jury. Expert testimony does not properly assist the trier of fact to decide a fact in issue if such testimony draws inferences or reaches conclusions within an exclusive function of the jury. *Niccols v. American Nat. Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) Resolution of disputes between examining physicians is for the jury, not an expert.

> "Because "[e]xpert evidence can be both powerful and quite misleading," a trial court must take special care to the weigh the risk of unfair prejudice against the probative value of the evidence under Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (internal quotations omitted). It is plain error to admit testimony that is a thinly veiled comment on a witness credibility, See *Witted* 11 F.3d at 786-87, . . .". *Nichols v. Am. Nat. Ins. Co.* 154 F.3d 875, 884 (8th Cir. 199).

Experts are not permitted to offer opinions as to the credibility of a witness. See *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973); *Mahone v. Lehman*, 347 F.2d 1170, 1174 (9th Cir. 2003).

**DR. WATSON SHOULD NOT BE ALLOWED TO SPECULATE ON WHAT ANOTHER DOCTOR WAS THINKING**

Dr. Watson wandered into the field of mind reading to support the Defendants. Dr. Graves, Ms. McCalla's attending orthopedic surgeon, during the time the Defendants were denying surgical authorization to remove pressure on Ms. McCalla's nerve, stated in his office notes:

> "I explained to her that removing the cyst will not resolve all of her symptoms. She will always likely have some discomfort because of this crushing blow." (Ex. 6, Dr. Graves 8/14/18 at CorVel EC McCalla File 000201)

> "Unfortunately, she has had many months of pressure on her nerves which makes our recovery even more difficult." (Ex. 5 Dr. Graves 10/16/18 at CorVel EC McCalla File 000230)

> "She certainly has failed conservative management. She has a component of neurogenic pain and I'm not certain we will solve all of her difficulty but she is improving and she has an obvious cyst on exam by MRI." (Ex. 5 Dr. Graves 11/27/18 at CorVel EC McCalla File 000292)

> "Essentially, she has failed conservative management and still has neuritic symptoms. The longer the procedure is postponed the prognosis can become worse because of chronic nerve impingement." (Ex. 5 Dr. Graves 1/10/19 at CorVel EC McCalla File 000343)

> "It is certainly unfortunate that it is taking so long as she is a chronic irritation of her nerves on the dorsal part of her foot." (Ex. 5 Dr. Graves 9/20/19 at CorVel EC McCalla File 001513)

Dr. Watson testified that his experience allowed him to "read between the lines in [Dr. Graves] notes" and conclude that Dr. Graves' believed that Ms. McCalla would be a patient who, unexplainably, won't get better. (Ex. 2: 36:10-38:23). In other words, in Dr. Watson's opinion, Dr. Graves believed Ms. McCalla is a flaky patient. Dr. Graves refutes this. (Exhibit 8, Dr. Graves deposition, 28:9-29:15, 42:1-25).

Courts may properly exclude expert evidence that is purely speculative. See *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-419 (7th Cir. 2005) (opinion based on "my opinion" and curriculum vitae inadmissible). Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind. *Siring v. Oregon State Bb. Of Higher Educ.*, 927 F.Supp. 1069, 1077 (D.Oregon 2013), citing *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715,720 (7th Cir. 1998).

**DR. WATSON SHOULD NOT TESTIFY ABOUT TREATMENT DR. GRAVES "COULD" HAVE PROVIDED BECAUSE IT WILL NOT HELP THE JURY UNDERSTAND THE EVIDENCE OR DETERMINE A FACT IN ISSUE**

Dr. Watson, in his report, opines:

> "Yes. I believe Dr. Graves correctly diagnosed and treated this patient. The patient had two previous aspirations [of the cyst] and I do believe an additional attempt could have been made by him prior to surgery. The two previous aspirations were not done by Dr. Graves, but were done elsewhere. There may have been a benefit achieved from Dr. Graves aspirating the cyst and potentially injecting some cortisone into the region to see if this would successfully quite [sic] the symptoms." (Ex. 1 at EXPERT WATSON REPORT 000023)

In his deposition, Dr. Watson agreed it would be inappropriate for him to question Dr. Graves medical decision making without knowing why Dr. Graves elected not to attempt further aspirations. (Ex. 2, 27:8-29:22)

Expert testimony on this topic is not relevant to the issues presented by this case. The limited issues presented by this bad faith case, in this context, are: 1) was it reasonable for Defendants to compel fourteen months of litigation for treatment authorization, with no further investigation, when their IME's prognosis of symptomatic

resolution within 6-8 weeks was proven to be wrong? and 2) did the delay in authorizing treatment contribute to the development of complex regional pain syndrome?

It is undisputed that McCalla had two attempted cyst aspirations before she came to Dr. Graves.  Dr. Graves testified that, in his experience, under these circumstances, a third attempted aspiration would not be beneficial. (Ex. 8, Dr. Graves depo., 32:17-34:17) Dr. Leonetti testified that a maximum of three aspirations can be attempted. (Ex. 2, 16:19-25) In addition, by October 16, 2018, the "cyst is now fully nodular; hardened and without apparent fluid pocket." (Ex. 9, FastMed 10/16/18, CorVel EC McCalla File 00237)

No doctor has opined that the failure to attempt a third aspiration, or inject steroids, had anything to do with the development of CRPS, or any other aspect of McCalla's medical progress, for that matter.  It is wholly irrelevant on the issue of causation.

Nor is such testimony relevant to the reasonableness of the Defendants' conduct. It is undisputed that the Defendants do not have the right to direct care.  (Ex. 10, Paul Burk depo., 82:8-18) (Ex. 11, Donna Huetter depo., 69:3-21) The Defendants were disputing the reasonableness of Dr. Graves' request to remove the cyst based on Dr. Leonetti's IME that, "assuming Ms. McCalla manages to avoid any further injury or trauma to her right foot, she would be expected to make a recovery within a 6-week time frame."  (Ex. 5, Dr. Leonetti 7/31/18 IME, at CorVel EC McCalla File 000579).  The disagreement between Dr. Leonetti and Dr. Graves was premised upon Dr. Leonetti's failure to appreciate nerve irritation as a component of McCalla's pain.  The Industrial

Commission adopted Graves' opinions over Dr. Leonetti's, and ruled in McCalla's favor on September 5, 2019. (Ex. 12, at ¶¶3-4) The issue of what is appropriate treatment is no longer up for debate. All that remains at issue is the reasonableness of the Defendants' investigation and evaluation. The compensability determinations are res judicata, and binding between these parties in this bad faith action. *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 157-58, ¶60, 306-307 (App. 2009).

## DR. WATSON SHOULD BE LIMITED TO THE CAUSAL REASONING STATED IN HIS REPORT

Rule 702 requires the complete basis for an expert's opinion, Dr. Watson, in his report, disputed that the delay in decompressing the nerves contributed to the development of CRPS. "While he is privy to his opinion as an expert, I do not believe we have the science to support this opinion. In fact, CRPS remains very difficult to diagnose and certainly I am not able to predict which of my patients will develop CRPS. Additionally, scientists are not sure why patients develop CRPS. Thus, stating that it was the delay in treatment that led to the CRPS is complete speculation and is unfounded by medical evidence." (Exhibit 1, Expert Watson Report at 00023) That is the causal opinion and its basis.

Dr. Watson does not cite any medical literature to support these opinions. While correct that the exact pathology of CRPS is not yet determined, there is a wealth of medical literature on the subject. Dr. Laitin cited six medical articles in his report, in support of his causal opinions. (Exhibit 4, McCalla Expert 00999) Dr. Watson was free to rebut these, or cite literature in support of his own opinion. He did neither. Expert reports eliminate unfair surprise and preserve resources. *Elgas v. Colorado Belle Corp.*,

179 FRD 296, 299 (D. Nev. 1998). The test under Rule 26(a)(2)(B) is "whether [the report is] sufficiently complete, detailed and in compliance with the rules so that surprise is eliminated, unnecessary depositions [ ] avoided, and costs are reduced." *Id*.

Dr. Watson should be free to state his opinion about the state of medical science. He should not be allowed to supplement the basis for that opinion with previously undisclosed new material.

## **CONCLUSION**

Wherefore, the Plaintiff prays for relief as set forth above.

RESPECTFULLY SUBMITTED this 24th day of September, 2021.

> ROBERT J. HOMMEL, P.C.
>
> By */s/ Robert J. Hommel*
> Robert J. Hommel
> 10214 N. Tatum Blvd.
> Phoenix, Arizona 85028
> *Attorneys for Plaintiff McCalla*

# CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2021, I electronically transmitted Notice of Service of the foregoing to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Stephen M. Dichter, Esq.
Gena L. Sluga-Dichter, Esq.
CHRISTIAN, KRAVITZ, DICHTER, JOHNSON & SLUGA, PLLC
2800 North Central Avenue, Ste. 860
Phoenix, Arizona 85004
*Attorneys for Defendants, CorVel Enterprise Comp, Inc. and
Ace American Insurance Company*

Gina M. Mushmeche, Esq.
CHRISTIAN, KRAVITZ, DICHTER, JOHNSON & SLUGA, PLLC
gmuscmeche@ksjattorneys.com
8985 S. Eastern Avenue
Suite 200
Las Vegas, Nevada 89123
*Attorneys for Defendants, CorVel Enterprise Comp, Inc. and
Ace American Insurance Company*

<u>/s/ Susan Castellaneta</u>
Susan Castellaneta

17