**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Ta'Laura McCalla,

        Plaintiff,

v.

ACE American Insurance Company, et al.,

        Defendants.

No. CV-20-01561-PHX-JAT

**ORDER**

      Pending before the Court are several motions in this workers' compensation case. This Order addresses Defendants' Motion for Summary Judgment (Doc. 99), Plaintiff's Motions to Exclude (Doc. 100, 101), Defendants' Motion to Exclude (Doc. 113), and various motions to seal and unseal documents (Doc. 106, 111, 114). The Court now rules.

## I.    BACKGROUND

      Plaintiff Ta'Laura McCalla was employed at Sprouts Farmer's Market (who is not a party to this litigation) and was injured on March 16, 2018, when a table extension fell on her right foot. (Doc. 1-2 at 11). Defendant ACE is an insurance company that insures Sprouts' workers' compensation claims, including McCalla's claim. (Doc. 1-2 at 10). Defendant CorVel is a third-party administrator hired by ACE to administer benefits to McCalla. (Doc. 1-2 at 11–12).

      Following her injury, CorVel directed McCalla to receive medical care at FastMed Occupational Clinic. (Doc. 99 at 3). She had a cyst on her right foot. (Doc. 99-4 at 3). Although she received treatment for three months, she still reported significant pain in her

foot and ankle. (Doc. 99 at 3–4).

CorVel then referred McCalla to an independent medical examination ("IME") with Dr. William Leonetti. (Doc. 99 at 4). Dr. Leonetti performed the IME on July 30, 2018, recommending conservative care. (Doc. 99-3 at 11). The following day, McCalla was evaluated by Dr. Stanley Graves. (Doc. 99 at 4). While Dr. Leonetti concluded that the pain would resolve in six weeks, Dr. Graves recommended surgical excision of the cyst and requested authorization to perform the surgery. (Doc. 99-6 at 2). On August 30, 2018, CorVel elected to deny surgery. (Doc. 99-8 at 2).

McCalla filed a request for a hearing in front of the Industrial Commission of Arizona (ICA), challenging CorVel's denial of surgery. (Doc. 99-12 at 2). McCalla still reported severe pain in her foot while going through the hearing process. (Doc. 107 at 3). And McCalla claims that Defendants—despite being notified that she was not improving— did nothing. (Doc. 107 at 5–8). After several hearings before the ICA, the ALJ determined that McCalla was entitled to the surgery recommended by Dr. Graves. (Doc. 99-22 at 2). On October 7, 2019, McCalla's cyst was removed. (Doc. 99-23 at 2).

McCalla, however, still reported discomfort following surgery. (Doc. 99 at 7). Dr. Graves suspected McCalla had Complex Regional Pain Syndrome ("CRPS") and referred her to Dr. Jeffery Scott. (Doc. 107 at 8). But CorVel voiced dissatisfaction with this choice and suggested Dr. Kevin Ladin. (Doc. 107 at 8). Five months after surgery, Dr. Ladin diagnosed McCalla with CRPS. (Doc. 107 at 8). Thereafter, Dr. Steven Laitin evaluated McCalla and agreed with the CRPS diagnosis. (Doc. 99 at 7). Additional examinations performed by Dr. Borowsky and Dr. Ott, however, dispute the CRPS diagnosis. (Doc. 99-26 at 6, Doc. 99-27 at 4).

McCalla alleges that she still suffers from leg and foot pain and has suffered a loss of function because CorVel delayed the surgery. She has brought the present case alleging that Defendants engaged in bad faith when evaluating her workers' compensation benefits. (Doc. 1-2 at 9). Defendants now request summary judgment on McCalla's bad faith, joint and several liability, and punitive damages claims. (Doc. 99 at 2).

## II.     PROCEDURAL BACKGROUND

On September 24, 2021, Defendants filed a Motion for Summary Judgment (Doc. 99). That motion is now fully briefed. (Doc. 108, 116). That same day, McCalla filed two motions seeking to limit or exclude Defendants' expert testimony (Doc. 100, 101). Those motions are also fully briefed. (Doc. 102, 103, 104, 105). Defendants also filed a Motion in Limine to exclude the expert testimony of Elliott Flood, (Doc. 113), and McCalla filed a Response. (Doc. 117). Finally, related to those filings, parties have filed various motions to seal and unseal documents. (Doc. 106, 110, 111, 114).

The Court will begin its discussion with the parties' motion to exclude or limit expert testimony. Next, the Court will address Defendants' motion for summary judgment. Finally, the Court will address the parties' motions to seal and unseal.

## III.    MCCALLA'S MOTIONS TO LIMIT/EXCLUDE EXPERT TESTIMONY

McCalla filed two motions seeking to limit or exclude expert testimony. (Doc. 100, Doc. 101). The motions are fully briefed. (Doc. 102, Doc. 103, Doc. 104, Doc. 105).

### A.  Legal Standard

Rule 702 of the Federal Rules of Evidence tasks a district court judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1313 (9th Cir. 1995). Rule 702 provides that expert testimony is admissible if:

> (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing Fed. R. Evid. 702).

Because "[e]xpert evidence can be both powerful and quite misleading," trial judges act as gatekeepers by making a preliminary assessment on whether proffered expert

testimony is admissible. *See Daubert*, 509 U.S. at 589, 595, 597. Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.

To satisfy Rule 702, the expert must be qualified, the expert's opinion must be reliable in that it is based on sufficient facts or data and is the product of reliable principles and methods, and the expert's testimony must fit the case such that the expert's opinions are relevant. *See id.* If the proposed testimony is relevant and reliable, its proponent is "entitled to have the jury decide upon [its] credibility, rather than the judge." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006).

### 1. Qualification

As an initial matter, the trial court must determine whether the witness is qualified as an expert by "knowledge, skill, training, or education." *Wagner v. ABW Legacy Corp*, No. CV-13-2245-PHX-JZB, 2016 U.S. Dist. LEXIS 29376, at *14 (Mar. 8, 2016) (citing Fed. R. Evid. 702). Because the rule "contemplates a broad conception of expert qualifications," only a "minimal foundation of knowledge, skill, and experience" is required. *Id.* (citing *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). A lack of particularized expertise "goes to the weight of the testimony, not its admissibility." *Id.* (citing *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993)).

### 2. Reliability

Next, the trial court must ensure that the proffered expert testimony is reliable. To evaluate reliability, the district court "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona*, 750 F.3d at 1044. These factors are nonexclusive, and "the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case." *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). Ultimately, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318. The test for reliability must be "flexible."

1   *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

2            3.   Relevance

3         Finally, the Court has a duty to ensure that the testimony is "relevant to the task at

4   hand" in that it "logically advances a material aspect of the proposing party's case."

5   *Daubert II*, 43 F.3d at 1315 (quoting *Daubert I*, 509 U.S. at 597). Expert testimony is

6   relevant if it assists the trier of fact in understanding evidence or in determining a fact in

7   issue. *Daubert I*, 509 U.S. at 591; *see also McKendall v. Crown Control Corp.*, 122 F.3d

8   803, 807 (9th Cir. 1997). Thus, the party proffering such evidence must demonstrate a valid

9   scientific connection, or "fit," between the evidence and an issue in the case. *Id.* "'Expert

10  testimony which does not relate to any issue in the case is not relevant and, ergo, non-

11  helpful.'" *Id.* (citation omitted).

12      **B. Discussion**

13        McCalla moves to limit testimony from Troy Watson, M.D. (Doc. 100). McCalla

14  also moves to exclude all expert testimony from Dr. Leonetti, Dr. Borowsky, and Dr. Ott.

15  (Doc. 101). The Court takes each in turn.

16      **1.  Troy Watson**

17        Defendants list Troy S. Watson, M.D. as a designated medical expert. McCalla

18  moves to prohibit any testimony under Rules 702 and 403 of the Federal Rules of Evidence.

19           a.   Qualifications

20        McCalla first challenges Troy Watson's qualifications, claiming that they are

21  marginal because he does not treat CRPS. (Doc. 100 at 2). Rather, he refers patients to a

22  pain management specialist. (Doc. 100 at 2). Defendants respond that "Dr. Watson is a

23  board-certified orthopedic surgeon with a subspecialty in foot and ankle orthopedic

24  medicine" and that CRPS is often first diagnosed "by an orthopedic surgeon and because

25  of his specialty being foot and ankle orthopedic medicine, he is often called upon to make

26  a diagnosis in a patient that does not have a readily notable diagnosis." (Doc. 103 at 2–3).

27        The Court agrees with Defendants that Dr. Watson's experience as an orthopedic

28  surgeon provides a "*minimal foundation* of knowledge, skill, and experience." *Hangarter*,

373 F.3d at 1016. To the extent that Dr. Watson lacks the qualifications to testify on the diagnosis and treatment of CRPS, that goes to "the weight of [the] testimony, not its admissibility." *Garcia*, 7 F.3d at 890.

b. Reliability

McCalla next argues that Dr. Watson's proffered testimony is unreliable because he never examined her. (Doc. 100 at 3). Specifically, McCalla points to Dr. Watson's deposition, in which he opined that CRPS can only be established "on an actual clinical encounter with the patient that includes a subjective history taking and conducting a physical exam." (Doc. 100 at 3 (quoting Watson Deposition Doc. 100-3 at 7–8)). She further points to Dr. Watson's statement admitting as such: "I am not convinced she had CRPS but again did not see her clinically making this a difficult judgment call." (Doc. 100 at 3 (quoting Watson Report Doc. 100-2 at 24)).

Defendants claim that Dr. Watson "provided a thorough analysis confirming that he personally reviewed the records provided in this case, the history of injury, and specifically outlined his review of MRI findings and other diagnostic testing administered before and after surgery." (Doc. 103 at 3–4).

Although Dr. Watson may be qualified to opine on CRPS, the Court finds portions of his testimony unreliable. He did not personally examine McCalla, and he said that a diagnosis of CRPS must be done through "an actual clinical encounter." (Doc. 100 at 4). Accordingly, the Court finds that Dr. Watson cannot opine on whether McCalla has CRPS. The Court also finds that Dr. Watson may not testify about what Dr. Graves was thinking from Dr. Graves' progress notes because such testimony would be speculative. (Doc. 100 at 12).

But Dr. Watson may testify about possible diagnoses for McCalla's symptoms and can opine on what he has observed to be the precipitating causes of CRPS. Dr. Watson can also testify about the alternative treatments that could have been provided to McCalla. The Court disagrees with McCalla that such testimony is irrelevant. (Doc. 100 at 14). Dr. Watson's testimony is potentially relevant to the reasonableness of Defendants' decision

to rely on Dr. Leonetti's recommendations.

Additionally, Dr. Watson can testify about the signs and symptoms observed by other doctors to the extent that it goes to Dr. Watson's opinion on alternative diagnoses or treatment options. Dr. Watson is not permitted to parrot the opinions of other experts or to vouch for those experts, but he can rely on the opinions stated by other experts. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (finding that an expert's opinion may be based in part on what a different expert believes); *In re Bard Ivc Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 U.S. Dist. LEXIS 211400 (D. Ariz. Dec. 22, 2017) (same).

Similarly, Dr. Watson may opine on symptom magnification as it relates to his opinion on alternative diagnoses or treatment options. The Court disagrees with McCalla that such testimony is an opinion on her credibility. (Doc. 100 at 10). Instead, the Court understands Dr. Watson's opinion to be that alternative treatments should have been explored before surgery given McCalla's alleged symptom magnification. While Dr. Watson's testimony may be damaging to McCalla's theory in the case, it does not make it credibility testimony. *See also Bamke v. J.B. Hunt Transp., Inc.*, No. 17-cv-1131, 2019 U.S. Dist. LEXIS 231029, at *11 (E.D. Wis. Oct. 22, 2019) (finding that expert testimony on symptom magnification was not prejudicial within the meaning of Rule 403 of the Federal Rules of Evidence); *Shock v. Ruan Transp. Corp.*, No. 3:11-CV-044-JD, 2013 U.S. Dist. LEXIS 140478, at *5 (N.D. Ind. Sept. 30, 2013) (finding cross examination, "not wholesale disqualification," was the proper solution to expert testimony on the issue of malingering).

Finally, McCalla argues that Dr. Watson should be limited to the causal reasoning stated in his report because Dr. Watson does not cite any medical literature to support opinions. (Doc. 100 at 15). Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In making his opinion, Dr. Watson cited to the Cleveland Clinic on the

1  causes of CRPS. (Doc. 100-2 at 25). Additionally, Dr. Watson relied on his experience
2  diagnosing patients in his practice. (Doc. 100-2 at 25). At this time, the Court will allow
3  Dr. Watson to proffer expert testimony. The Court will deal with remaining questions of
4  admissibility as they arise at trial.

5  <center>c.  <u>Conclusion</u></center>

6  In sum, the Court will grant in part and deny in part McCalla's motion as to Dr.
7  Watson.

8  <center>**2.  Dr. Leonetti**</center>

9  McCalla next seeks to exclude Dr. Leonetti's expert testimony because he was not
10 properly disclosed as an expert witness and his testimony is irrelevant. (Doc. 101). The
11 Court will deny the motion.

12 <center>a.  <u>Disclosure</u></center>

13 McCalla argues that Defendants' disclosure of Dr. Leonetti—along with Dr.
14 Borowsky and Dr. Ott—was "devoid of any 'summary of the facts and opinions' required
15 by Rule 26(a)(2)(C)." (Doc. 101 at 6). Defendants argue that each doctor's testimony is
16 related to their "clinical evaluations" of McCalla completed in connection with her
17 workers' compensation case, not the litigation pending before this Court. (Doc. 102 at 4).
18 Thus, Defendants argue they disclosed each doctor as a "percipient witness and, out of an
19 abundance of caution, pursuant to Fed. R. Civ. Pro. 26(a)(2)(C)." (Doc. 102 at 4).

20 Treating physicians need not provide a "written report" under Federal Rule of Civil
21 Procedure ("Rule") 26 to the extent that their opinions are formed during treatment.
22 *Goodman v. Staples the Office Superstore LLC*, 644 F.3d 817, 826 (9th Cir. 2011).
23 Nonetheless, if a treating physician is to testify as an expert, as opposed to a fact witness,
24 he or she must be disclosed pursuant to Rule 26(a)(2)(C). Fed. R. Civ. P. 26 (Advisory
25 Committee Notes to 2010 Amendments). Rule 26(a)(2)(C) requires "(i) the subject matter
26 on which the witness is expected to present evidence under Federal Rule of Evidence 702,
27 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected
28 to testify." Fed. R. Civ. P. 26(a)(2)(C). "Any summary disclosure must contain enough

<center>- 8 -</center>

detail so that the opposing party can "immediately . . . identify whether it needs a responsive witness and the information that such responsive witness would need to address." *Cooke v. Town of Col. City*, No. CV-10-08105-PCT-JAT, 2013 U.S. Dist. LEXIS 19439, 2013 WL 551508, at \*4 (D. Ariz. Feb. 13, 2013). Courts have summarily rejected the argument that mere disclosures of treatment records without an accompanying disclosure summary satisfies Rule 26(a)(2)(C). *See, e.g.*, *Torres v. Transguard Ins. Co. of Am.*, No. CV-13-01578-PHX-ROS, 2015 U.S. Dist. LEXIS 182310, at \*6 (D. Ariz. June 26, 2015); *Merck v. Swift Transp. Co.*, No. CV-16-01103-PHX-ROS, 2018 U.S. Dist. LEXIS 226723, at \*2 (D. Ariz. Sep. 24, 2018).

In examining the Defendants' disclosures in this case, the disclosures include the same generic language: "Dr. Leonetti will testify about that examination based upon his own recollection, IME report, records, first-hand knowledge, observations and perceptions." (Doc. 101-6 at 3–4). The disclosures also say that the doctors' testimony "may include certain opinions." (Doc. 101-6 at 3–4). But the disclosures fail to include what the doctors' "actual opinions are regarding the issues." *Jones v. Colo. Cas. Ins. Co.*, No. CV-12-01968-PHX-JAT, 2015 U.S. Dist. LEXIS 141897, at \*8 (D. Ariz. Oct. 19, 2015).

Despite the inadequate summaries, Defendants contend that they complied with Rule 26 because each doctor authored IME reports that were "disclosed in their entirety in this litigation." (Doc. 102 at 4). And that the doctors' opinions were the result of a clinical examination of McCalla, "a report of the same and firsthand knowledge." (Doc. 102 at 4).

While mere disclosure of treatment records without an accompanying disclosure summary fails to satisfy Rule 26(a)(2)(C), *Jones*, No. CV-12-01968-PHX-JAT, 2015 U.S. Dist. LEXIS 141897, at \*9, the Court finds that IME reports do satisfy the rule. Since medical records are not typically created in anticipation of litigation, they frequently fail to provide an accurate or complete summary of expected testimony. *See id.* at \*13–14. But the IME reports provide an accurate summary of expected testimony and the opinions of the experts. After reviewing the reports, the Court finds that they were sufficient for

- 9 -

1    McCalla to prepare to meet the doctors' opinions at trial.

2         In her Reply, McCalla argues that Defendants intend to use these physicians for

3    undisclosed opinions at trial, specifically causal opinions about CRPS. (Doc. 105 at 3).

4    Defendants write, "the Defendants are nevertheless entitled to present evidence and

5    argument that its handling of McCalla's worker's compensation claim did not proximately

6    cause her to develop CRPS." (Doc. 102 at 6). The Court does not read this statement to

7    mean that the experts will opine on the causal nature of CRPS. Rather, Defendants argue

8    that they are still entitled to argue the reasonableness of Dr. Leonetti's observations and

9    opinions notwithstanding the ICA's decision in favor of surgery.

10        Accordingly, Dr. Leonetti may testify at trial to his examination of McCalla, his

11   diagnosis and prognosis based on his examination, and his review of the medical records

12   as constrained by his written IME report.[1]

13                        b.   Relevance

14        McCalla also argues that Dr. Leonetti's testimony should be excluded because it is

15   irrelevant as he did not have any information beyond his written report until the night

16   before his testimony. (Doc. 101 at 6). Defendants argue that "any testimony from Dr.

17   Leonetti will focus on his independent medical examination of McCalla, his IME reports

18   and the testimony he has already provided before the ICA." (Doc. 102 at 5).

19        The Court finds that Dr. Leonetti remains a relevant expert witness. Dr. Leonetti

20   reviewed Dr. Graves' medical reports before the hearing and maintained his testimony.

21   (Doc. 102 at 5). Dr. Leonetti's examination and opinion are relevant to McCalla's bad faith

22   claim.

23        Next, McCalla argues that Dr. Leonetti was forced to comply with Rule 26(a)(2)(B)

24   because he received additional reports outside the course of treatment. (Doc. 101 at 7).

25   Because he did not, McCalla argues that his testimony should be limited to non-expert

26   testimony. (Doc. 101 at 13).

27   _____

28   [1] Because the Court finds Defendants satisfied Rule 26(a)(2)(C), the Court declines to consider Defendants' argument that McCalla was required to meet and confer under Local Rule 7.2(1).

If Defendants intend to have Dr. Leonetti present opinions developed beyond the course of treatment, then a Rule 26(a)(2)(B) report was required for those additional opinions. *See Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). But it is unclear on the record before the Court that Dr. Leonetti formed his opinions outside the course of treatment. The deposition McCalla cites to references that Dr. Leonetti reviewed Dr. Graves' records but does not indicate that it helped to form his opinion. (Doc. 101-8 at 3). Insofar as Dr. Leonetti intends to testify to opinions formed outside the course of treatment, the Court finds that such testimony falls outside the scope of the "treating physician" exception and would require disclosure of written reports under Rule 26(a)(2)(B).

Finally, McCalla argues that Dr. Leonetti's testimony on correct medical treatment analysis is irrelevant because the ALJ determined that Dr. Graves' medical opinion was more probably correct than Dr. Leonetti's opinion. (Doc. 101 at 8). Specifically, McCalla argues that the determination is "res judicata and binding between the parties." (Doc. 101 at 8 (citing *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 157 (Ct. App. 2009)). Defendants concede that the ICA's determination is binding between the parties, but they can still present evidence and argument about "its handling of Plaintiff's worker's compensation claim." (Doc. 102 at 6).

As discussed above, the Court agrees that Dr. Leonetti remains a relevant witness despite the preclusive effect of the ICA's determination. Dr. Leonetti's testimony remains relevant about whether CorVel had a reasonable basis to deny McCalla's surgery. To the extent that Dr. Leonetti's testifies about what the correct medical treatment was, that would be precluded by the ICA's determination.

### c.  Conclusion

In sum, the Court will deny McCalla's motion as to Dr. Leonetti.

### 3.  Dr. Borowsky

McCalla next seeks to exclude all expert testimony from Dr. Borowsky on grounds that he was not properly disclosed and that his diagnostic comments are duplicative and

1    unreliable. The Court will deny the *Daubert* motion seeking to preclude Dr. Borowsky's

2    expert testimony.

3                                    a.    Disclosure

4           Like with Dr. Leonetti, McCalla argues that Defendants' disclosure of Dr.

5    Borowsky was "devoid of any 'summary of the facts and opinions' required by Rule

6    26(a)(2)(C). (Doc. 101 at 6). For the reasons stated above for Dr. Leonetti, the Court finds

7    that Defendants properly disclosed Dr. Borowsky, and that he may testify at trial to his

8    examination of McCalla, his diagnosis and prognosis based on the examination and his

9    review of the medical records as constrained by his written IME report.

10                                   b.    Duplicative

11          McCalla next argues that Dr. Borowsky's testimony is duplicative because Dr.

12   Watson will testify on "both diagnosis and causation," which is what Dr. Borowsky will

13   testify on. (Doc. 101 at 12).

14          On the record before the Court, the Court disagrees that Dr. Borowsky's expert

15   testimony is cumulative and duplicative. The district court has the discretion to "exclude

16   relevant evidence if its probative value is substantially outweighed by a danger of . . .

17   confusing the issues [or] misleading the jury." Fed. R. Evid. 403. Here, Dr. Borowsky's

18   opinion is specific to his medical evaluation of McCalla. The Court will deny McCalla's

19   Motion on this point but will allow her to re-raise the issue at trial when the Court will be

20   in a better position to evaluate the issue of whether the testimony is duplicative.

21                                   c.    Reliable

22          McCalla next argues that Dr. Borowsky's opinion is unreliable. It is unclear from

23   the motion what part of Dr. Borowsky's opinion is unreliable. Though McCalla does argue

24   in her Reply that his opinion lacks "adequate factual analysis." (Doc. 105 at 7). There is

25   also a reference in her Motion about his opinions being incomplete. (Doc. 101 at 12).

26          Dr. Borowsky took a history of McCalla, conducted a physical examination, and

27   made conclusions based upon his clinical evaluation. Based on a thorough review of the

28   record and Dr. Borowsky's report, the Court finds that Dr. Borowsky's conclusions and

report are based on sufficient facts to be found reliable.

### d.  Conclusion

In sum, the Court will deny McCalla's motion as to Dr. Borowsky.

### 4.  Dr. Ott

Finally, McCalla seeks to exclude all expert testimony from Dr. Ott on grounds that he was not properly disclosed and that his diagnostic comments are duplicative and unreliable. The Court will deny the *Daubert* motion seeking to preclude Dr. Ott's expert testimony.

### a.  Disclosure

Like with Dr. Leonetti and Dr. Borowsky, McCalla argues that Defendants failed to properly disclose Dr. Ott as an expert witness. (Doc. 101 at 6). And like with Dr. Leonetti and Dr. Borowsky, the Court declines to exclude Dr. Ott from testifying as an expert witness. Dr. Ott may testify at trial to his examination of McCalla, his diagnosis and prognosis based on the examination and his review of the medical records as constrained by his written IME report.

### b.  Duplicative

McCalla next argues that Dr. Ott's testimony should be excluded because it is duplicative. (Doc. 101 at 12). For the reasons expressed above with Dr. Borowsky, the Court disagrees and will deny Plaintiff's Motion on this point. McCalla will be able to re-raise this issue at trial.

### c.  Reliable

Finally, McCalla argues that Dr. Ott's opinion is unreliable and not relevant. (Doc. 101 at 11). Specifically, McCalla claims that Dr. Ott's opinions on her hip and knee condition are not relevant because she has "not alleged any issues related to her hip or knee." (Doc. 101 at 12).

Dr. Ott is an orthopedic surgeon who examined McCalla and noted that McCalla's injury was inconsistent with CRPS. (Doc. 99-27 at 5). Dr. Ott's determination was consistent with the appropriate methods described in Dr. Watson's testimony to diagnose

1 CRPS: an orthopedic surgeon in "an actual clinical encounter with the patient." (Doc. 100-

2 2 at 7). Dr. Ott's IME report also describes how McCalla reported problems with her hip

3 and knee following surgery, and he examined her to evaluate those problems. (Doc. 102-

4 12 at 3). He also examined her foot. (Doc. 102-12 at 4). On the record before the Court,

5 the Court will deny McCalla's motion on this point. The Court will allow her to re-raise

6 the issue at trial when the Court will be in a better position to evaluate the issue of whether

7 the testimony is relevant.

d. <u>Conclusion</u>

8

9 In sum, the Court will deny McCalla's motion as to Dr. Ott.

10 **C. Conclusion**

11 Accordingly, the Court will deny in part and grant in part McCalla's Motion to Limit

12 Testimony from Troy Watson (Doc. 100). The Court will also deny McCalla's Motion to

13 Exclude Expert Testimony from Dr. Leonetti, Dr. Borowsky, and Dr. Ott (Doc. 101).

14 **IV.   DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF**

15 **ELLIOTT FLOOD**

16 Defendants also filed a Motion in Limine seeking to preclude the expert testimony

17 of Elliott Flood. (Doc. 113). Defendants argue that Flood's testimony is not reliable nor is

18 it based on sufficient facts or data. (Doc. 113 at 3–5).

19 **A. Legal Standard**

20 As discussed above, under Rule 702, an expert may testify based on "scientific,

21 technical, or other specialized knowledge" if it "will assist the trier of fact to understand

22 the evidence," provided the testimony rests on "sufficient facts or data" and "reliable

23 principles and methods," and "the witness has reliably applied the principles and methods

24 to the facts of the case." Fed. R. Evid. 702(a)–(d). The proponent of expert testimony has

25 the ultimate burden of showing, by a preponderance of the evidence, that the proposed

26 testimony is admissible under Rule 702. *See Lust by & Through Lust v. Merrell Dow*

27 *Pharm*, 89 F.3d 594, 598 (9th Cir. 1996). The trial court acts as a gatekeeper to assure that

28 expert testimony "both rests on a reliable foundation and is relevant to the task at hand."

1   *Daubert*, 509 U.S. at 597. Rule 702's requirements and the Court's gatekeeping role apply

2   to all expert testimony, not just scientific testimony. *Kumho Tire*, 526 U.S. at 147.

3   **B. Discussion**

4   Elliott Flood is a retired insurance company executive and accountant who now

5   serves as an independent consultant. (Doc. 117 at 2). Defendants contend that Flood failed

6   to reliably apply the principles and methods of Arizona workers' compensation law to the

7   facts of this case. (Doc. 113 at 2). Additionally, Defendants allege that Flood's opinions

8   are not based on sufficient facts or data. (Doc. 113 at 5). In Response, McCalla contends

9   that Flood is a qualified expert in the insurance industry, and that his testimony will help

10   the jury understand the claims process. (Doc. 117 at 2).

11   Defendants first argue that Flood's opinions do not meet the requirements for

12   reliability. (Doc. 113 at 3). Specifically, Defendants contend that Flood's opinions do not

13   reflect the reliable application of principles of Arizona workers' compensation law because

14   he did not cite to the relevant Arizona workers' compensation statutes. (Doc. 113 at 3–5).

15   Defendants claim Flood's "lack of familiarity with Arizona claims handling and workers'

16   compensation rules, as well as his failure to reliably apply claims handling principles to

17   the facts of this case, render his opinions inadmissible." (Doc. 113 at 4).

18   But by all accounts, McCalla is not offering Flood as an expert on Arizona law.

19   Rather, she is offering him as an expert on the insurance industry's standard procedures.

20   (Doc. 117 at 2). And Defendants have not explained why his expertise in standard

21   procedures for insurance claims mean that he cannot testify. Defendants instead argue that

22   they were permitted to obtain IME reports under Arizona law contrary to Flood's

23   testimony. (Doc. 113 at 4–5). As the Court reads Flood's report, Flood was not saying that

24   Defendants could not obtain an IME report under Arizona law, but rather, should not have

25   obtained an IME report. (Doc. 113-3 at 5–6).

26   Defendants next claim that Flood's opinion is not based on sufficient facts or data

27   when he objected to CorVel's use of an IME. (Doc. 113 at 5). Defendants argue that Flood

28   gets Arizona law wrong as well as the actual order of events. (Doc. 113 at 6). McCalla

contends that it is Defendants' expert that made an unfounded assertion and Flood correctly stated Arizona law. (Doc. 117 at 9).

As discussed above, Flood is an expert on insurance industry customs, practices, and standards. To the extent that Flood misstated Arizona law or the facts of the case, that goes to the weight, not the admissibility of his testimony.

Defendants further claim that Flood's testimony is unreliable because he accused Dr. Leonetti of bias with "nothing more than speculation," but then abandoned the claim upon seeing the evidence. (Doc. 113 at 6). The Court finds it appropriate for Flood to testify based on his experience, review of the evidence, and consideration of Dr. Graves' report that Flood believes that the IME by Dr. Leonetti was improper. But Flood cannot testify that Dr. Leonetti "almost always testifies in favor of the insurance company" because Flood did not rely on sufficient facts or data to come to this conclusion. (Doc. 113-3 at 5).

Finally, Defendants seek to preclude Flood from testifying on CorVel's corporate motivations, including cost containment procedures. (Doc. 113 at 8). Defendants claim that is an inappropriate subject for expert testimony. (Doc. 113 at 8). McCalla argues that Flood does not testify about state of mind, but rather, circumstantial evidence of an evil mind. (Doc. 117 at 13).

A plaintiff may meet the clear and convincing standard for punitive damages by either direct or circumstantial evidence, and an evil mind may be inferred from a defendant's conduct or objectives. *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 604 (Ct. App. 2012). To the extent that Flood's testimony is based on his view of the corporate motivation of CorVel, expert testimony as to such matters is ordinarily inappropriate. *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998); *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert testimony as to corporate motivation and intent as not based on any relevant body of knowledge or expertise and as assuming the role of advocate). Such testimony lacks the requisite helpfulness for expert testimony because "[t]he jury is sufficiently capable of drawing its own inferences" on those topics. *Hunton v. Am. Zurich Ins. Co.*, No. CV-16-

00539-PHX-DLR, 2018 U.S. Dist. LEXIS 37061, at *7 (D. Ariz. Mar. 7, 2018) (citing *Siring v. Or. State Bd. of Higher Educ*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013)).

Here, Flood may testify about Defendants' actions in relation to applicable industry standards, but he may not state conclusions about Defendants' motives or mindset in pursuing that course of conduct. Additionally, he may testify as to how the insurance industry interprets terms on CorVel's Form 10K.

## V.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants have also filed a motion for summary judgment on McCalla's claims, arguing that there is no evidence of bad faith or concert of actions. (Doc. 99 at 2). Additionally, Defendants claim that McCalla has not shown that she is entitled to punitive damages. (Doc. 99 at 2).

### A.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . .  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A–B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is

1  any factual issue that may affect the outcome of the case under the governing substantive
2  law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do
3  more than simply show that there is some metaphysical doubt as to the material facts" by
4  "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"
5  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting
6  Fed. R. Civ. P. 56(e)).

7      **B. Discussion**

8          1. <u>Bad Faith</u>

9      Federal courts sitting in diversity jurisdiction apply relevant state substantive law
10  and federal procedural law. *Cty. of Orange v. United States Dist. Court*, 784 F.3d 520, 527
11  (9th Cir. 2015). Under Arizona law, "[t]he tort of bad faith arises when the insurance
12  company intentionally denies, fails to process[,] or [fails to] pay a claim without a
13  reasonable basis for such action." *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188 (1981).
14  The test for bad faith requires that a court conduct a two-part analysis. "First is the objective
15  inquiry: did the insurer act unreasonably toward the insured? Second is the subjective: did
16  the insurer act knowingly or with reckless disregard as to the reasonableness of its actions?"
17  *Demetrulias v. Wal-Mart Stores, Inc.*, 917 F. Supp. 2d 993, 1004 (D. Ariz. 2013) (citation
18  and internal quotation marks omitted).

19      The objective inquiry is satisfied based on insurer's "failure to immediately conduct
20  an adequate investigation, failure to act promptly in paying a legitimate claim, forc[ing] an
21  insured to go through needless adversarial hoops to achieve its rights under the policy,
22  lowball[ing] claims, and similar conduct." *Id.* (quoting *Zilisch v. State Farm Mut. Auto.*
23  *Ins. Co.*, 196 Ariz. 234, 238 (2000)) (internal quotation marks omitted).

24      McCalla first points to CorVel's decision to rely on Dr. Leonetti's testimony to deny
25  surgery and argues that it was unreasonable to do so. McCalla also argues that CorVel
26  "abandon[ed]" its "ongoing duty to evaluate the claim" when she did not get better. (Doc.
27  107 at 13).

28      Defendants argue that CorVel's decision was based on the opinion of a qualified

doctor and conflicting medical evidence. (Doc. 99 at 12). And Defendants claim it was "not unreasonable for an insurer to resolve good faith doubts about the claims against the claimant." (Doc. 99 at 14).

Here, McCalla has presented material facts of Defendants' objectively unreasonable behavior. First, McCalla has presented evidence that CorVel unreasonably relied on Dr. Leonetti in the face of evidence that suggested McCalla was not experiencing symptom magnification. Additionally, McCalla has presented evidence that CorVel unreasonably proceeded with the ICA hearing despite its awareness of her stagnant progress. *See Gastelo v. Wesco Ins. Co.*, No. CV-18-02659-PHX-MTL, 2020 U.S. Dist. LEXIS 46731, at *12 (D. Ariz. Mar. 18, 2020) (finding objective inquiry satisfied where plaintiff had to "file a claim with the Industrial Commission to prompt" defendants into action).

The second inquiry requires an examination of the insurer's subjective intent. To survive summary judgment, a plaintiff must show that the defendants' conduct exceeds mere negligence. "The 'intent' required here is an 'evil hand' to do the act . . . [T]he insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds. But an 'evil mind' is not required; the insurer need not intend to harm the insured." *Demetrulias*, 917 F. Supp. 2d at 1005 (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 160 (1986)). The facts of this case present a close call between what can be described as Defendants' negligence in handling McCalla's claim and the "evil hand" standard articulated in *Rawlings*.

The Court finds that McCalla has shown enough to survive summary judgment on the second factor. After electing to follow Dr. Leonetti's recommendation to deny surgery, McCalla has presented evidence that CorVel failed to investigate whether Dr. Leonetti erred considering the mounting evidence of McCalla's condition. (Doc. 107 at 6–7). Though CorVel's adjusters were notified of McCalla's condition, they refused to authorize surgery citing the litigation process. (Doc. 107 at 6–7).

Defendants note that McCalla received authorization for the surgery shortly after the ICA's determination. (Doc. 99 at 7). But a satisfactory end-result did take a very long

time and a great deal of effort on McCalla's part. "Intent is established when an insurer lacked a founded belief that its conduct was permissible. The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Demetrulias*, 917 F. Supp. 2d at 1005 (quoting *Rawlings*, 151 Ariz. at 160) (internal quotation marks and citation omitted).

Fundamentally, McCalla contends that Defendants unreasonably denied her claim to save money. (Doc. 107 at 12–16). From her viewpoint, any alleged unreasonable conduct on the part of Defendants is explained by a pretextual financial motive. (Doc. 107 at 12–16). Based on the facts presented, a reasonable jury could reach a conclusion that Defendants improperly denied McCalla's claim by following the recommendation of Dr. Leonetti. A jury could also conclude that they intentionally failed to engage in an adequate investigation each of the many times that they received updates on McCalla's condition. Thus, McCalla has presented enough facts to preclude summary judgment in favor of Defendants.

Lastly, Defendants argue that A.R.S. § 23-930 divests this Court of jurisdiction over bad faith claims. (Doc. 99 at 16). Defendants argue that the statute required McCalla to exhaust administrative remedies by filing a bad faith claim with the IAC before filing her bad faith claim here. (Doc. 99 at 17).

Although the ICA has exclusive jurisdiction over workers' compensation claims in Arizona, a workers' compensation carrier can nonetheless be liable for the common law tort of bad faith in a district court because such a tort is "separate and not a direct or natural consequence of the compensable industrial injury." *Merkens v. Fed. Ins. Co.*, 237 Ariz. 274 (Ct. App. 2015). To bring a claim of bad faith denial of benefits against an insurance carrier, however, an aggrieved claimant must first obtain a "compensability determination from the [IAC]." *Id.* at 1115. This ensures that the IAC's exclusive jurisdiction to determine entitlement to benefits and the amount of benefits is not being circumvented. *Id.*

Here, McCalla has a compensability determination from the IAC, and she does not

claim that her damages are tied to the compensability determination. Instead, she alleges that Defendants improperly handled her claim. (Doc. 107 at 2). Since the Court is not asked to determine whether the injured worker is entitled to benefits, the present case does not tread on the exclusive jurisdiction of the ICA. *Bussen v. N. Pointe Ins. Co.*, No. CV-20-00486-PHX-JJT, 2022 U.S. Dist. LEXIS 22473, at *15 (D. Ariz. Feb. 8, 2022) (declining to find that court lacked jurisdiction to hear bad faith claim).

Accordingly, the Court will deny Defendants' Motion for Summary Judgment on McCalla's bad faith claim.

### 2. Joint and Several Liability

Defendants next claim that McCalla has not presented evidence that Defendants are jointly and severally liable and that their conduct constituted acting in concert. (Doc. 99 at 14).

Under Arizona law, a separate cause of action does not exist for joint and several liability. Instead, joint and several liability is a question of the degree of fault of each party. Arizona has abolished joint and several liability in most tort cases under A.R.S. § 12-2506. Section 12-2506 preserves joint and several liability in a few narrow classes of cases: 1) when tortfeasors act in concert, 2) when one is an agent or servant of the other, and 3) when a defendant's liability for the fault of another arises out of a duty created by a federal employers' liability statute. A.R.S. § 12-2506(D).

While in her complaint McCalla alleged joint and several liability under a concert of actions claim,[2] (Doc. 1-2 at 22), it appears McCalla now seeks joint and several liability under a principal-agent theory: "[j]oint and several liability attaches to principals and agents." (Doc. 107 at 17). Because CorVel provided third party administration of ACE's compensation policy, McCalla argues that ACE is liable for the actions CorVel took. (Doc. 107 at 2).

A principal is generally not liable for the conduct of nonservant agents. *Ford v.*

---

[2] Had McCalla maintained her concert of action, the Court would have granted Defendants' summary judgment as McCalla has not provided any evidence that suggests the parties "made a conscious agreement to commit an intentional tort." *Mein v. Cook*, 219 Ariz. 96, 99 (Ct. App. 2008).

*Revlon, Inc.*, 153 Ariz. 38, 42 (1987). A principal will be liable, however, if the principal had a "nondelegable duty to the public interest." *Sprint Communs. Co., L.P. v. W. Innovations, Inc.*, 618 F. Supp. 2d 1101, 1115 (D. Ariz. 2009); *Wiggs v. City of Phx.*, 198 Ariz. 367, 369–70 (2000). Though McCalla cites to *Nelson v. Grayhawk Props. L.L.C.*, 209 Ariz. 437 (Ct. App. 2004) to show joint and several liability applies, the court there also stated the general rule that "where there is a non-delegable duty, the principal is liable for the negligence of the agent." *Id.* at 440. But McCalla has failed to produce any evidence that ACE possessed a nondelegable duty in the administration of her workers' compensation claim. Nor has the Court found any nondelegable duty. Further, McCalla has failed to show that ACE was acting in bad faith or was involved in the claims administration. *See Sprint Communs.*, 618 F. Supp. 2d at 1116 (noting that a principal may remain liable if it retains the control of any part of the work); Restatement (Second) of Torts § 414.

McCalla has failed to demonstrate that ACE possessed a nondelegable duty which would make ACE jointly liable for CorVel's bad faith. Therefore, the Court will grant Defendants' Motion for Summary Judgment on McCalla's joint and several liability claim. McCalla's remaining claims will proceed against Defendant ACE and CorVel under comparative fault.[3]

### 3.  Punitive Damages

Lastly, Defendants claim that there is not a triable issue of fact as to McCalla's request for punitive damages. (Doc. 99 at 16).

Under Arizona law, a separate cause of action does not exist for punitive damages. Rather, "the right to an award of punitive damages must be grounded upon a cause of action for actual damages." *Quiroga v. Allstate Ins. Co.*, 151 Ariz. 127, 129 (Ct. App. 1986). Though a plaintiff can recover punitive damages on a bad faith claim, punitive damages may not be awarded "unless the evidence reflects 'something more than the conduct

---

[3] Though the Court has not seen any evidence that implicates Defendant ACE, the Court declines to grant summary judgment for ACE on the remaining claims because ACE did not individually move for summary judgment if the Court granted its motion regarding joint and several liability.

necessary to establish the tort.'" *See Rawlings*, 151 Ariz. at 162 (citation omitted). "[T]here must be evidence of an 'evil mind' and aggravated and outrageous conduct." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326 (1986). Thus, the evidence must support a showing that the carrier:

> (1) intended to cause injury; (2) engaged in wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, even though the carrier had neither desire nor motive to injure.

*Temple v. Hartford Ins. Co. of the Midwest*, 40 F. Supp. 3d 1156, 1171 (D. Ariz. 2014). Thus, summary judgment on the issue of punitive damages should be denied where a reasonable jury could find the requisite evil mind by clear and convincing evidence. *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 558 (1992).

 Defendants argue that they have not committed "any intentional act that would rise to the level of allowing punitive damages." (Doc. 99 at 16). McCalla argues that Defendants delayed treatment of her CRPS for months solely due to financial reasons amounts to an evil mind. (Doc. 107 at 16).

 Here, the Court finds that a reasonable jury could conclude that Defendants' failure to properly handle McCalla's injury claim satisfies the third punitive damages factor. *See, e.g.*, *Gastelo*, No. CV-18-02659-PHX-MTL, 2020 U.S. Dist. LEXIS 46731, at *16 (allowing punitive damages claim to continue where there was evidence that defendants initially wrongfully withheld workers' compensation benefits); *Garibaldi v. Everest Nat'l Ins. Co.*, No. CV-19-02558-PHX-DLR, 2021 U.S. Dist. LEXIS 153243, at *8 (D. Ariz. Aug. 12, 2021) (allowing punitive damages claim to survive where there was evidence that defendants sought out an IME to deny claim). Specifically, Defendants delayed in responding when McCalla said that her symptoms outlasted Dr. Leonetti's prognosis. McCalla has also presented sufficient evidence that a reasonable jury could conclude that Defendants' failure to act was motivated by financial considerations. For these reasons, Defendants' Motion for Summary Judgment on the punitive damages claim is denied.

 **C. Conclusion**

1    For the above reasons, the Court will deny Defendants' Motion for Summary

2    Judgment on the bad faith and punitive damages claims but will grant summary judgment

3    on the joint and several liability claim.

4    **VI.    MOTIONS TO SEAL AND UNSEAL**

5    Parties have filed various motions to seal and unseal (Docs. 106, 110, 111, 114) in

6    conjunction with the motions in limine and motion for summary judgment.

7    **A.  Legal Standard**

8    It has long been recognized that the public has a "general right to inspect and copy

9    public records and documents, including judicial records and documents." *Nixon v. Warner*

10   *Commc'ns*, 435 U.S. 589, 597 (1978). Though access to judicial records is not absolute, a

11   strong presumption of access exists for records not traditionally kept secret. *Kamakana v.*

12   *City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

13   A party seeking to seal a judicial record bears the burden of overcoming this

14   presumption by either meeting the "compelling reasons" standard if the record is a

15   dispositive pleading, or the "good cause" standard if the record is a non-dispositive

16   pleading. *Id.* at 1180. Those compelling reasons must outweigh the competing interests of

17   the public in having access to the judicial records and understanding the judicial process.

18   *Id.* at 1178–79. What constitutes a "compelling reason" is "best left to the sound discretion

19   of the trial court." *Nixon*, 435 U.S. at 599.

20   In the business context, a "trade secret may consist of any formula, pattern, device

21   or compilation of information which is used in one's business, and which gives him an

22   opportunity to obtain an advantage over competitors who do not know or use it." *Elec.*

23   *Arts, Inc. v. United States Dist. Court (In re Elec. Arts, Inc.)*, 298 F. App'x 568, 569–70

24   (9th Cir. 2008) (quoting Restatement (First) of Torts § 757, cmt. b (1939)). As this Court

25   has observed in the past, "because 'confidentiality alone does not transform business

26   information into a trade secret,' a party alleging trade secret protection as a basis for sealing

27   court records must show that the business information is in fact a trade secret." *PCT Int'l*

28   *Inc. v. Holland Elecs. LLC*, 2014 U.S. Dist. LEXIS 133539, at *5 (D. Ariz. Sept. 23, 2014)

1   (citation omitted). In other words, "[s]imply mentioning a general category of privilege,

2   without any further elaboration or any specific linkage with the documents, does not satisfy

3   the burden." *Kamakana*, 447 F.3d at 1184.

4   **B.  Analysis**

5       The parties move to seal and unseal both dispositive and non-dispositive motions.

6   Because different standards apply to each type of motion, *see id.* at 1180, the Court will

7   analyze the motions individually.

8                    1.  Plaintiff's Response Motion for Summary Judgment

9       In conjunction with her Response to Defendants' Motion for Summary Judgment,

10  (Doc. 108), McCalla filed a motion to unseal both her Response and attached document.

11  (Doc. 106). The document is one page from CorVel's Services Agreement ("Agreement")

12  with Sprouts and is referenced—and redacted—in McCalla's response. (Doc. 106 at 1–2).

13  McCalla argues that the document does not warrant sealing because it only discusses how

14  CorVel selects physicians to perform IMEs. (Doc. 106 at 2). Defendants oppose McCalla's

15  motion, arguing that the information is proprietary and confidential. (Doc. 110 at 3).

16  Specifically, Defendants argue disclosure could provide other claims administrators with

17  information that could harm CorVel's competitive standing. (Doc. 110 at 4).

18      As this is a dispositive motion, "compelling reasons" must exist to seal the response.

19                          *a.  Plaintiff's Response Brief*

20      The Court will grant Plaintiff's Motion to Unseal her Response for Summary

21  Judgment. After review of Plaintiff's Response, the Court is not persuaded that the

22  information warrants sealing under the compelling reasons standard.

23      The Response contains two sentences that are redacted. *See* (Doc. 108 at 3, 12). But

24  one of the sentences is the first sentence in McCalla's argument concerning why it was

25  unreasonable to rely on Dr. Leonetti. (Doc. 108 at 12). The rest of the section does not

26  make sense without its inclusion.

27      More importantly, Defendants have failed to demonstrate the documents they seek

28  to seal contain protectable trade secrets. While Defendants argue that the Agreement was

marked confidential and contains trade secrets, Defendants have failed to show how these specific excerpts constitute a trade secret. *Jones*, No. CV-12-01968-PHX-JAT, 2014 U.S. Dist. LEXIS 167407, at *8. In short, given the centrality of the Agreement to the case, Defendants' general proprietary interest is not a compelling reason to seal the records from public access. Accordingly, the Court will unseal McCalla's Response brief.

### b.  Services Agreement Excerpt

McCalla also move to unseal Exhibit C, which is the source of the redacted sentences in her Response brief. After review of the document, the Court finds that the information does not constitute a trade secret. Thus, the Court will not permit this exhibit to be filed under seal.

### 2.  Defendants' Response Opposing Unsealing

Defendants filed a Response to McCalla's Motion to Unseal. (Doc. 110). Concurrently, Defendants filed a Motion to Seal their Response and attached exhibit. (Doc. 111). Defendants seek to seal these documents because the "Response and the Exhibit contains references to the confidential CorVel Enterprises Comp., Inc. Services Agreement." (Doc. 111 at 2). Specifically, these documents contain some of CorVel's trade secrets on how it selects doctors and services.

### a.  Defendants' Response Brief

In Defendants' Response opposing McCalla's Motion to Unseal, Defendants extensively quote from a section of the Agreement which defines "Confidential Information." (Doc. 110 at 2–3). This information is redacted.

Defendants' request to seal the motion is not supported by compelling reasons. As described above, Defendants reference the Agreement and the confidential nature of it. But a "party's designation of a document as confidential, however, is not per se good cause." *Blue Cross of Cal. v. Insys Therapeutics*, No. CV-17-02286-PHX-DLR, 2018 U.S. Dist. LEXIS 245025, at *5 (D. Ariz. Dec. 11, 2018). In their motion, Defendants do not describe how the redacted information contains trade secrets. Instead, Defendants rely on the confidential nature of the Agreement to say that the redacted information is necessarily a

trade secret. Because the Court is precluded from hypothesizing or assuming that a "good cause" exists, Defendants will not be permitted to redact this information.

### b.   Services Agreement

Defendants also seek to seal their attached exhibit which is a seventy-two-page Services Agreement between CorVel and Sprouts. The Agreement contains information on the Fees, Customer Insurance Coverage Limits, and License Agreement. (Doc. 111 at 3).

In reviewing the Agreement, the Court finds that some of the information contains trade secrets and meets the standards for sealing. Some information, however, does not. To the extent that the Court has discussed that the information does not meet the standards for sealing, that information will be unsealed. The Court will allow the remaining information to be sealed as sealing the document will not interfere with the public's interest in understanding Defendants' brief. *See e.g., Aviva USA Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1273–74 (D. Ariz. 2012) (finding that sealing document did not interfere with understanding of the judicial process because the dispositive motion did not address information found in that document).

### 3.   Defendants' Motion in Limine

Defendants also seek to seal an exhibit attached to their Motion to Exclude. (Doc. 114). Defendants have redacted two paragraphs in the Expert Witness Disclosure of Elliott Flood. (Doc. 113 at 9–10). Like in the above motions to seal/unseal, Defendants argue that sealing is necessary because the document references CorVel's confidential services agreement with Sprouts. (Doc. 114 at 3). McCalla did not file a response.

 After review of the exhibit, the Court finds that Defendants have met the compelling reasons test to warrant sealing. The Court finds that sealing the document does not interfere with the judicial process because the motion does not address the information found in the document. The Court will permit this exhibit to be sealed.

### VII.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiff's Motion to Limit Testimony (Doc. 100) is **denied**

**in part** and **granted in part**. Specifically, with respect to Troy Watson, MD, the motion is granted that Dr. Watson cannot opine on whether McCalla has CRPS or what Dr. Graves was thinking from Dr. Graves' progress notes; the motion is denied in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Expert Testimony (Doc. 101) is **denied**. Dr. Leonetti, Dr. Borowsky, and Dr. Ott may testify at trial to their examinations of McCalla, their diagnosis and prognosis based on the examinations and their review of the medical records as constrained by their written IME reports.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude (Doc. 113) is **denied in part** and **granted in part**. Elliott Flood cannot opine on Dr. Leonetti's favoritism of the insurance company or state conclusions about Defendants' corporate mindset or motivations; the motion is denied in all other respects.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 99) is **denied in part** and **granted in part**. Specifically, McCalla's claim for concert of actions is **dismissed**. McCalla's bad faith and punitive damages claim remain.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Unseal (Doc. 106) is **granted**. The Clerk of Court shall unseal and file Plaintiff's Proposed Response to Defendants Summary Judgment that is lodged at Docket No. 107.[4]

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal (Doc. 111) is **denied in part** and **granted in part**. Within **seven (7)** days, Defendants shall refile their unsealed Response in Opposition to Plaintiff's Motion to Unseal lodged at Docket No. 112. Defendants shall also file the Services Agreement under seal as an additional attachment.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal (Doc. 114) is **granted**. The Clerk of Court shall file under seal the document lodged at Docket No. 115.

Dated this 23rd day of June, 2022.

James A. Teilborg
Senior United States District Judge

---

[4] The Court has filed it into the record notwithstanding Local Rule Civil 5.6.